223 N.J. Super. 239 (1987)
538 A.2d 448
JUANITA JOHNSON, PLAINTIFF,
v.
COUNTY OF ESSEX AND THE TOWNSHIP OF SOUTH ORANGE VILLAGE, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Law Division Essex County.
Decided April 30, 1987.
*242 Beverly M. Wurth for plaintiff (Alfred A. Porro, Jr., attorney)
Charles Rawitz, Assistant County Counsel for defendant, County of Essex (H. Curtis Meanor, Acting Essex County Counsel, attorney)
Hari G. Ahrens for defendant Township of South Orange Village (Golden, Lintner, Rothschild, Spagnola & DiFazio, attorneys)
VILLANUEVA, J.S.C.
This is a complaint by a downstream land owner against two public entities for damages and inverse condemnation, alleging *243 that the county and municipality permitted upstream development and designed, installed and maintained drainage pipes and roads that have caused the drainage pipe running under plaintiff's property to deteriorate and disintegrate, thereby causing settlement of part of her property.
The issues in this non-jury trial are (1) whether the defendant public entities have plan or design immunity pursuant to the Tort Claims Act, N.J.S.A. 59:4-6; (2) whether the Township has immunity under N.J.S.A. 59:2-5 when issuing permits, licenses and approvals for upstream development; (3) whether both public entities have immunity under N.J.S.A. 59:2-3(a) when exercising discretion vested in the entities; (4) whether both public entities have immunity under N.J.S.A. 59:4-2 because their action or failure to take action was not palpably unreasonable, and (5) whether plaintiff has a right to inverse condemnation.
The court holds that both public entities have immunity and the actions they took to protect against the condition or failed to take were not palpably unreasonable. Therefore, plaintiff has failed to show any right to inverse condemnation.

HISTORICAL BACKGROUND
The North Wyoming Avenue extension in South Orange was constructed in 1913 after the map of the extension was approved by the Essex County Engineer and Essex County Board of Freeholders on March 13, 1913. During the construction on North Wyoming Avenue at the subject site (before any house was erected thereon), the County constructed a 48-inch, triangular-shaped, cast iron "sperry" culvert in an established watercourse.
The downstream end of the culvert extended 26 feet east of the present easterly line of the County right-of-way. In 1922 the County installed 12 feet of 36-inch reinforced concrete pipe on the downstream end of the culvert and graded the sidewalk area. The stream at this end was an open channel running *244 downstream easterly of the County construction. Any piping of this stream downstream was done by others.
After plans were prepared for a house on the subject property by William E. Lehman, architect, dated July 9, 1928, a 36-inch concrete pipe was installed across and under the subject property. This pipe was installed before the house was built by a predecessor in title of plaintiff because the house could not have been built beforehand.

DEVELOPMENT OF UPLAND AREA
For hundreds of years, surface waters have flowed easterly from the Newstead area of South Orange and the adjacent area of West Orange in the manner of the top of a "Y", merging into one stream, Mountain House Brook, just west of North Wyoming Avenue, and then proceeding down to a branch of the East Rahway River at the bottom of the hill. The natural water courses which run into the River predate all construction in the area.
The upland drainage area was developed in a manner similar to the plaintiff's property, but mostly afterwards. The Township did not install the original drainage piping around Blanchard Road, which is upland west of plaintiff's property. A Mr. Barkhorn later bought all of Blanchard's interest in that property and developed it. Houses were built on the Blanchard property in 1920 and 1924, and the Robinson Atlas, dated 1928, in the Township Engineer's office shows Blanchard Road. There was nothing unusual about the drainage system installed in the Blanchard Road area. When Blanchard Road and Crest Circle became in poor condition, the street areas were deeded to the Township, and the streets became part of the Township road reconstruction. Because the drainage systems were in poor condition, in disrepair and undersized by today's standards, they were repaired by the Township with new inlets and catch basins being modernized, all of which was approved by the governing body.
*245 There was also new road and piping installed by a developer of Newstead North, which was extended later by a property owner, all done in accordance with plans approved by the Township in the late 1940's.
Plaintiff concedes there was nothing unreasonable or improper about how prior owners installed the roads, drainage pipes, and catch basins.
An expert produced by the plaintiff, using a county map, indicated the extent of the upland watershed and the amount of piping. This map shows that (a) approximately 58% of the drainage pipes were installed by property owners in South Orange after all necessary approvals by Township officials; (b) approximately 40% of the drainage pipes were installed by property owners in West Orange or by the Township of West Orange, but (c) less than 2% of the piping in the watershed was installed by the Township of South Orange Village itself, one pipe just west of North Wyoming Avenue.
The Township does not own any piping on or under North Wyoming Avenue, a County road.

PROBLEM WITH PLAINTIFF'S PROPERTY
Plaintiff, Juanita Johnson, is the owner of property at 398 North Wyoming Avenue, which she purchased in 1966. A large English Tudor house with a three-car attached garage was built on the property some time after 1928. This property is almost level, although it has a slight decline towards the rear. Obviously, the developer of the property a long time ago changed the elevation because there is a retaining wall approximately 20 feet high running along the rear of the property. Plaintiff first became aware of a problem on her property about four years ago, when she noticed indentations in the ground, i.e., surface holes and depressions as large as eight inches in diameter. The affected area is about five feet from the side of her house near the garage area. She later noticed the holes getting deeper. Plaintiff's son went into one of the holes, and it was almost as *246 deep as his entire body. Plaintiff believed that a small car could fit into one of the holes.
It was not until the plaintiff called the Township, or (as she said) maybe the County, that she was told that there was a pipe exiting through the rear of her property. Plaintiff was never previously advised that a pipe was going through or under her property.
The Township has consistently told the plaintiff that wherever the problem exists, it is not on the property of the Township. The County came out on two occassions about three years ago and dumped two truck loads of dirt and rock on plaintiff's property to fill the holes.
Plaintiff is also having trouble with the hedges and the underground water sprinklers on her property.
When the garage floor sank 10 to 12 inches about two years ago, plaintiff had a new floor installed.

CONCLUSION OF PLAINTIFF'S EXPERT
Stanley Lacz, a licensed architect, engineer and planner testified for the plaintiff based primarily upon his examination of County and Township maps and two examinations of the site in June 1985. He observed a hole about 50 feet from the sidewalk, about 20 feet north of plaintiff's garage. The erosion or hole on plaintiff's premises is 72 feet east of the easterly line of the County right-of-way or 35 feet beyond any County construction.
At the westerly side of the plaintiff's property is a culvert, which allows water to flow from the westerly side of North Wyoming Avenue to the easterly side and then under the plaintiff's property, where the water flows in a general southeasterly direction underground in a pipe, which Mr. Lacz testified was reinforced concrete, since he had observed it, to a retaining wall at the rear of plaintiff's property. There the storm water is deposited into an open stream bed. Along the path between the easterly side of North Wyoming Avenue and *247 the plaintiff's easterly property line are large potholes or subsidences in the grade.
Mr. Lacz observed the following problems:
1) At the bottom of the pipe, a channel has been cut out from erosion on the soils and aggregates against the pipe. At some locations, the pipe is worn right through to the subsoil below, creating pools within the pipe floor. Some are 3 feet long by 18 inches wide;
2) Many sections of the pipe have the top portions which have longitudinal cracks with openings as large as 1/2 inch to 3/4 inch;
3) Many of the joints between sections of the pipe are open as much as a couple of inches;
4) Many sections of the pipe are deformed. Instead of being circular, the sections have been pushed down to be elliptical in shape;
5) Longitudinal cracks were caused because of external pressure which caused sections to become elliptical in shape.
When comparing the development of the upland drainage basin as it is presently developed to that which was extrapolated from historic data (Sanborn Maps), the development has been substantial. The natural soils which are pervious to rain, in other words, allow rain water to seep into the ground, are now made impervious by the pavements of roadways, sidewalks, walkways, roofs, and similar construction. Also, the area is denuded of substantial amount of vegetation which holds soils and moisture within the soils.
Due to the impervious characteristics of the changed upland area, there is increased volume of water. Also with the increased volume is an increased speed of the storm water. The volume is increased because the impervious conditions cause more water to flow more quickly into the drainage ditches, streams, pipes, and to the location of the intake of the storm water pipe which runs under the plaintiff's property. In other *248 words, the hysteresis of the system has been substantially modified, causing larger volumes of storm water to flow more quickly through the pipe. Additionally, due to the increased speed and volume, the water also contains pollutants, including salt from winter de-icing of the roadways and sand used for the same purposes. An element which compounds the problem is that the upland roadways and driveways of the drainage basin are rather steep and require a substantially greater amount of sanding and salting than level roadways. Also coming down the pipe is more particulate which collects on the impervious surfaces such as roadways and roofs, and then is washed into the storm water drainage system.
Mr. Lacz believed that failure of the storm water pipe is directly related to the development of the upland area and the deterioration of plaintiff's pipe because of an increased volume of water with increased speed and the storm waters contain sand and particulate, thereby causing a wearing or channelization of the storm water pipe to the point where the pipe has been worn completely through. This then weakens the pipe and causes it, with weight of soils above, to change in shape from circular to elliptical. Salts in water cause corrosion of the steel reinforcing in the concrete pipe and the failure of those of that reinforcing. The failure of the reinforcing occurs in two ways: (1) The sacrificing of the metals to the oxide state and causing its weakness because of thinness, and then (2) additionally, that oxide of iron takes up more volume and as such, pops the concrete reducing the cross-sectional area of the pipe. The pipe is in a state of failure and at any point and time could completely collapse preventing proper flowage of storm water through the plaintiff's property, possibly causing a substantial amount of property damage and producing a hazard to humans.
It is Mr. Lacz' opinion that because of the substantial development of the upland drainage basin above the plaintiff's drainage pipe, which runs through the plaintiff's property, it has increased the flow and speed of storm waters. He believed that the causality of the failure is related to the development of *249 the upland drainage basin by the removal of the natural vegetation, by the construction of impervious surfaces and by the salting and sanding of the roadways. He says these factors have caused the eroding of the bottom of plaintiff's drainage pipe which is now worn out from the grind. He believed that plaintiff's drainage pipe, no matter what its construction was, should have lasted 100 years under normal conditions. Mr. Lacz acknowledged that the watershed west of plaintiff's property consists of approximately 100 acres in South Orange and 46 acres in West Orange.

TOWNSHIP'S EXPLANATION
Arnold Knudson, the Township Engineer since 1969 and who is a licensed professional engineer, surveyor and planner, oversees the sewer and water departments of the Township. He was familiar with the plaintiff's property but had never actually entered plaintiff's drainage pipe. He knew that the drainage pipe was approximately 20 feet underground at the westerly side of the plaintiff's property and 12 to 16 feet underground at the rear of her property by the retaining wall. The court accepts what he said that: (a) a pipe cannot become elliptical except because of external pressure; (b) pipe joints were not mortared as a matter of course when plaintiff's pipe was installed but they are today; (c) failure to lay the pipe properly could have caused the pipe to fail, and (d) separation of the joints, the cracking on the top and deterioration of joints could have caused the failure. He believed that the plaintiff's pipe has failed because it was not adequate for the load because it was not properly bedded and because of external pressure of the backfill.
He concluded, and the court accepts it as a fact, that the increase of the water flow should have had no effect on the pipe if it had been a proper one that was properly installed. This is important because it shows that the failure of the pipe was not reasonably foreseeable by defendants.

*250 COUNTY'S MOTION PURSUANT TO R. 4:37-2(b)
The County constructed the North Wyoming Avenue extension with its drainage facilities long before one of plaintiff's predecessors in title installed the drainage pipe on the subject property. Therefore, at the conclusion of plaintiff's proofs the court dismissed the complaint against the County because (1) the work had been done pursuant to plans approved in advance of construction by the Board of Freeholders, giving it immunity under N.J.S.A. 59:4-6; (2) there was no dangerous condition on its property, and (3) the action it took or failed to take was not palpably unreasonable.
The plaintiff's construction expert acknowledged that it was not unreasonable for the County to install catch basins where and in the manner it did in 1913, nor was it unreasonable for the County today to have catch basins and drainage pipes and the sperry culvert under North Wyoming Avenue.

A MUNICIPALITY'S LIABILITY FOR DAMAGE CAUSED BY THE FLOW OF SURFACE WATERS
The liability of a private person who causes waters to artifically gather and discharge into a natural stream is determined under "the reasonable use doctrine". In Armstrong v. Francis Corp., 20 N.J. 320 (1956), the Court held, with regard to this doctrine:
The issue of reasonableness or unreasonableness becomes a question of fact to be determined in each case upon a consideration of all the relevant circumstances, including such factors as the amount of harm caused, the foreseeability of the harm which results, the purpose or motive with which the possessor acted, and all other relevant matter.... It is therefore properly a consideration in these cases whether the utility of the possessor's use of his land outweighs the gravity of the harm which results from his alteration of the flow of surface waters. [at 330; citations omitted]
This holding is in accord with the presently-existing law of nuisance, namely, an intentional invasion of another's use of property is unreasonable if:
(a) The gravity of the harm outweighs the utility of the actor's conduct, or

*251 (b) The harm caused by the conduct is serious and the financial burden of compensating for this and similar harm to others would not make the continuation of the conduct not feasible. [Restatement (Second) of Torts, Section 826 (1979)].
Birchwood Lakes Colony Club v. Medford Lakes, 90 N.J. 582, 592 (1982).
Any liability of a public entity is subject to any defenses that would be available to the public entity if it were a private person as well as any immunity of the public entity provided in the Tort Claims Act. N.J.S.A. 59:2-1(b).
There is only one case which addresses the issue of a municipality's liability, within the context of the Tort Claims Act, for damage allegedly caused by the flow of surface waters. In Birchwood Lakes Colony Club v. Medford Lakes, the plaintiffs claimed that the Borough of Medford was responsible for the eutrophication of a pond due to the discharge of sewage from a plant operated by the Borough. The court found that a cause of action for nuisance is cognizable under the Tort Claims Act.
It relied on two sections of the Act to reach this decision, one being N.J.S.A. 59:4-2, which creates liability for a dangerous condition on a public entity's property. This section was deemed to impose "liability upon a municipality in its status as property owner for nuisance where its actions can be found to be `palpably unreasonable.'" 90 N.J. at 594.
Additionally, the court held that the immunities provided within the Act relating to planning and design, as well as discretionary authority, would be applied to the pertinent facts of a given case when nuisance was at issue.

THE TOWNSHIP HAS IMMUNITY UNDER VARIOUS PROVISIONS OF THE TORT CLAIMS ACT

(a) The Township has immunity for issuing permits and approvals under N.J.S.A. 59:2-5.

The plaintiff contends that the Township approved subdivisions that brought about excessive development upstream *252 from her property, thereby increasing the flow of water through her drainage pipe, that led to its deterioration and subsequent damage to her property. However, under N.J.S.A. 59:2-5, the Township is immune from tort liability arising out of their approval of upstream subdivisions and development, such as for the area in question.
N.J.S.A. 59:2-5 states that:
A public entity is not liable for an injury caused by the issuance, denial, suspension or revocation of, or by the failure or refusal to issue, deny, suspend or revoke, any permit, license, certificate, approval, order, or similiar authorization where the public entity or public employee is authorized by law to determine whether or not such authorization should be issued, denied, suspended or revoked.
This provision cloaks the State with absolute immunity when an injury was caused by "... issuance ... of ... any permit, license, certificate, approval, order or similar authorization" by the State and applies to all phases of the licensing function, Vacirca v. Consolidated Rail Corp., 192 N.J. Super. 412, 417 (Law Div. 1983), whether or not the governmental acts be classified as discretionary or ministerial. Malloy v. State, 76 N.J. 515, 521 (1978).
This immunity is necessitated by the almost unlimited exposure to which public entities would otherwise be subjected if they were liable for the numerous occasions on which they issue, deny, suspend or revoke permits and licenses. 1972 Task Force Comment to N.J.S.A. 59:2-5; Report of Attorney General's Task Force Report on Sovereign Immunity 213 (1972).
In 1972, New Jersey enacted the Tort Claims Act, N.J.S.A. 59:1-1, et seq., in response to the Supreme Court's decision in Willis v. Department of Cons. & Econ. Dev., 55 N.J. 534 (1970), which all but eliminated sovereign immunity in actions brought against the State and other public entities. In enacting that statute, the Legislature recognized that while an entrepreneur may readily be held liable for negligence within the chosen ambit of his activity, the area within which government has the power to act for the public good is almost without limit and *253 therefore the government should not have the duty to do everything that might be done. N.J.S.A. 59:1-2. Consequently, the Legislature declared "... that public entities shall only be liable for their negligence within the limitations of this act and in accordance with the fair and uniform principles established herein." N.J.S.A. 59:1-2; see Christmas v. Newark, 216 N.J. Super. 393 (App.Div. 1987).
The State is immune from liability for licensing or failure to revoke landfill licenses or for licensing of companies which transported wasted to the landfills. Kenney v. Scientific, Inc., 204 N.J. Super. 228 (Law Div. 1985).
Clearly, the Township is immune herein for approving subdivisions and granting building permits.

(b) The Township has plan and design immunity under N.J.S.A. 59:4-6 because development plans were approved by the Planning Board or governing body.

All development upstream was done after either the Planning Board or governing body approved subdivisions which included plan and design of off-site improvements, such as drainage pipes and catch basins.
A public entity has design immunity even if it installs a defective drainage pipe so long as "the plan or design has been approved in advance of the construction or improvement by the legislature or the governing body of a public entity." Costa v. Josey, 83 N.J. 49 (1980).
N.J.S.A. 59:4-6 provides:
Neither the public entity nor a public employee is liable under this chapter for an injury caused by the plan or design of public property, either in its original construction or any improvement thereto, where such plan or design has been approved in advance of the construction or improvement by the Legislature or the governing body of a public entity or some other body or a public employee exercising discretionary authority to give such approval or where such plan or design is prepared in conformity with standards previously so approved.
Therefore, the Township has a plan or design immunity.

*254 (c) The Township has immunity because it is not liable for an injury resulting from the exercise of judgment or discretion vested in the entity, under N.J.S.A. 59:2-3(a).

In Brenner v. Jackson Tp., 94 N.J. Super. 445 (App.Div. 1967), the plaintiff sued the township for injuries sustained when he drove his car over an unprotected drop at the end of a deadend street. The court held that the approval of a zoning subdivision and the act of constructing a street within that area all involved discretionary governmental functions. The court further held that any acts or omissions which arose out of exercise or performance, or failure to exercise or perform, a discretionary function in the execution of a municipal planning statute or ordinance enacted pursuant to it could not give rise to liability in tort.
Another case that is analagous to the one at bar is Woodsum v. Pemberton Tp., 172 N.J. Super. 489 (Law Div. 1980), where the court held that the lowering of a water table as a result of construction of a water plant by the township, which deprived landowners completely of any water supply for their residences, could not be the subject of a tort claim since it involved a discretionary action of the township.
A recent case from the State of Indiana held that a city's decision to install a sewer system constituted the performance of a discretionary function immune from liability under the Indiana Tort Claims Act. The appellate court defined discretion, when it applies to government entities, as the "option to act or not as deemed necessary and the exercise in judgment and choice involved in what is proper and just under the circumstances." Rodman v. City of Wabash, 497 N.E.2d 234 (Ind.Dist.Ct.App. 1986).
The State of Indiana has a Tort Claims Act which has a provision, I.C. 34-4-16.5-3(6), substantially similar to N.J.S.A. 59:2-3(a), that provides complete immunity to governmental entities for the performance of a discretionary function, such as *255 the city's decision to install a sewer system. 497 N.E.2d at 238-40.
Since the actions taken by the Township, sub judice were clearly discretionary actions, N.J.S.A. 59:2-5 cloaks the Township with tort immunity for injury arising from those actions.

(d) The Township has immunity under N.J.S.A. 59:4-2 because no property of the Township was in a "dangerous condition"; the damage to plaintiff's pipe was not reasonably foreseeable; furthermore, the actions the Township took or did not take to protect against the condition were not palpably unreasonable.

Public entity liability for dangerous conditions of public property is not governed by the general rule of vicarious liability as set forth under N.J.S.A. 59:2-2 relating to the public entity's liability for injuries caused by the acts of its employees. Rather, public entity liability with respect to dangerous conditions of public property is governed by the specific provisions of Chapter 4, and a claimant must satisfy all of the requirements of 59:4-2 in order for liability to attach. Comment to N.J.S.A. 59:4-2, Margolis and Novack, Tort Claims against Public Entities (1986).
In order for a party to recover he must prove (1) that a dangerous condition existed on the property at the time of the injury; (2) that the dangerous condition proximately caused the injury; (3) that the dangerous condition created a foreseeable risk of the kind of injury incurred, and (4) that either (a) a public employee created the dangerous condition, or (b) that a public entity had actual or constructive notice of the dangerous condition in sufficient time prior to the injury to have protected against the condition. Kolitch v. Lindedahl, 100 N.J. 485, 492 (1985); see also Brown v. Brown, 86 N.J. 565, 575 (1981) and Polyard v. Terry, 160 N.J. Super. 497, 508 (App.Div. 1978), aff'd o.b. 79 N.J. 547 (1979).
*256 "Dangerous condition" means a condition of property that creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used. N.J.S.A. 59:4-1(a).
The act extends to public entities the usual obligations of private parties with respect to dangerous conditions on their property, subject to a special provision in recognition of the difficulties inherent in a public entity's responsibility for maintaining its vast amounts of public property. 1972 Task Force Comment to N.J.S.A. 59:4-2; Report of the Attorney General's Task Force on Sovereign Immunity 220-221 (1972). A road or highway falls within the definition of "public property." The plain language of N.J.S.A. 59:4-1(c) would seem to include a roadway. "In the absence of an explicit indication of a special meaning, the words of a statute are to be given their ordinary and well understood meaning." Safeway Trails, Inc. v. Furman, 41 N.J. 467, 478 (1964), cert. den. 379 U.S. 14, 85 S.Ct. 144, 13 L.Ed.2d 84 (1964); Whaley v. County of Hudson, 146 N.J. Super. 76 (Law Div. 1976).
The most significant fact in this case is that there was no showing that there was anything wrong or improper with the drainage systems west of plaintiff's property. The problem is not with the stream or the upstream piping  but it is the pipe on plaintiff's property. Therefore, there is no dangerous condition on any Township property.
Another reason plaintiff cannot succeed is that the alleged "dangerous condition" did not create a reasonably foreseeable risk of the kind of injury or damage that occurred. The Township could not reasonably foresee that the pipe installed by plaintiff's predecessor in title was installed improperly or that the pipe would not last, under any circumstances, for at least 50 years. Plaintiff's own expert said the pipe should have lasted 100 years under normal conditions.
*257 In fact, the County's culvert pipe was installed at least six years before the one on the subject property and there is no evidence of any failure of that pipe.
In Kolitch v. Lindedahl, the court concluded that the term palpably unreasonable "implies behavior that is patently unacceptable under any given circumstances." 100 N.J. at 493.
To be palpably unreasonable, it must be action or inaction that is plainly and obviously without reason or reasonable basis, capricious, arbitrary or outrageous. Williams v. Phillipsburg, 171 N.J. Super. 278, 286 (App.Div. 1979).
The elements of a cause of action against a public entity to recover for injury caused by condition of its property are: ... palpable unreasonability of the public entity's failure to take protective measures, and proximate cause relationship between dangerous condition and injury. Speaks v. Jersey City Housing Auth., 193 N.J. Super. 405 (App.Div. 1984), certif. den. 97 N.J. 655 (1984).
Less than 2% of the drainage systems were done by any employee of the Township whereas the balance was done by private property owners in South Orange or West Orange or by the Town of West Orange itself.
There was ordinary development of the property west of the subject property. Plaintiff has failed to show that there was anything wrong or unreasonable about how the owners of the upstream property installed the piping and drainage facilities.
Therefore, the action that the Township took or did not take to protect against the deterioration of plaintiff's pipe was not palpably unreasonable. It was not even unreasonable.

PLAINTIFF HAS FAILED TO SHOW ANY BASIS FOR AN INVERSE CONDEMNATION.
Plaintiff contends that there has been an implied dedication of her pipe to the public use by both the County and the Township of South Orange Village, resulting in a taking by way *258 of inverse condemnation of a portion of her property, insofar as the County and the Township of South Orange Village have in effect condemned a portion of it for use as a drainage easement for which they are now responsible.
Inverse condemnation proceedings are initiated by a landowner whose property has been taken de facto to obtain proper compensation. Van Dissel v. Jersey Central Power & Light Co., 152 N.J. Super. 391 (Law Div. 1977), aff'd 181 N.J. Super. 516, 525-526 (App.Div. 1981), certif. den. 89 N.J. 409 (1982), cert. granted and vacated 465 U.S. 1001, 104 S.Ct. 989, 79 L.Ed.2d 224 (1984), on remand 194 N.J. Super. 108 (App.Div. 1984), certif. den. 99 N.J. 186 (1984).
A property owner is barred from any claim to a right of inverse condemnation unless deprived of all or substantially all beneficial use of the totality of his property as result of excessive police power regulation. Orleans Builders & Developers v. Byrne, 186 N.J. Super. 432 (App.Div. 1982).
Plaintiff's appraiser, Edward J. Patterson, testified that the market value of the premises as of September 30, 1985 was $365,000. He made no attempt to show any diminution in value because of holes or settlement of surface soils. There was no testimony that plaintiff has been deprived of all or substantially all her property or that the damage had caused a diminution in its value.
Plaintiff's complaint asserts no cause of action for nuisance. Plaintiff cannot create an ownership issue on the part of the Township by alleging inverse condemnation.
In the case at bar the liability, if any, of the Township must fall within the confines of the Tort Claims Act. The pipe which is located under plaintiff's property does not belong to the Township. The pipe was put in place by a predecessor in title to plaintiff for his own benefit. This fact alone may not bar an action for nuisance. However, plaintiff is trying to circumvent the Tort Claims Act and the law set forth in Birchwood Lakes *259 Colony Club, 90 N.J. 582 by asserting a cause of action for inverse condemnation. Birchwood, makes it clear that if a plaintiff is asserting that an unreasonable use or invasion of his or her land is being occasioned by the defendant public entity, the cause of action lies in nuisance not inverse condemnation, stating that failure to allow a nuisance action would result in a taking without compensation. This holding is in accord with cases decided prior to the effective date of the Tort Claims Act. Plaintiff's reliance on Field v. West Orange, 46 N.J. Eq. 183 (Ch. 1889), for allowing a cause of action for inverse condemnation is unjustified. The court in Field held that a municipality would have to answer for alleged damage caused by their rechanneling of water because "... without being answerable for the consequences, they would, in effect, have power to condemn private property to public use without compensation." Id. at 187.
Therefore, plaintiff has proved no right to inverse condemnation.
Judgment for defendants.